IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JANET Y. NEABUHR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 11-102-CJP |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Janet Y. Neabuhr is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

## Procedural History

Ms. Neabuhr applied for benefits in April, 2008, alleging disability beginning on March 9, 2005. (Tr. 189-193).

The application was denied initially and on reconsideration. After holding a hearing, ALJ Christina Young Mein denied the application for benefits in a decision dated July 9, 2010. (Tr. 10-22). Plaintiff's request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 12.

1

## Issue Raised by Plaintiff

Plaintiff raises one point, that is, that the ALJ erred in weighing the medical evidence with regard to her mental impairments.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Ms. Neubuhr is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richard v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Mein followed the five-step analytical framework described above. She determined that Ms. Neabuhr had not been engaged in substantial gainful activity since the alleged onset

3

date, and that she has severe impairments of fibromyalgia, depression, anxiety, asthma, diabetes, obesity, hypertension and right shoulder impingement. She further determined that these impairments do not meet or equal a listed impairment. The ALJ found that Ms. Neabuhr has the residual functional capacity (RFC) to perform a limited range of work at the light exertional level. Based on the testimony of a vocational expert, the ALJ found that Ms. Neabuhr has the capacity to perform jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the point raised by plaintiff. As she does not challenge the ALJ's decision with respect to her physical impairments, the Court will not discuss that evidence in detail.

**1.     Agency Forms**

Ms. Neabuhr was born in 1956, and was 48 years old when she allegedly became disabled. She was last insured for DIB as of June 30, 2009. (Tr. 246-247). She filed a prior claim for disability benefits which was denied on November 30, 2007. (Tr. 247).

She had previously worked as an administrative assistant in the airline industry and as a medical librarian (Tr. 240).

**2.     Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on June 24, 2010. (Tr. 20).

At the time of the hearing, Ms. Neabuhr was 53 years old. She had a college degree in Geography. (Tr. 33). She was 5'7" tall and weighed 230 pounds. (Tr. 39).

With regard to her mental impairments, plaintiff testified that she has had depression

since she was a child, and it keeps getting worse. (Tr. 44). She said she has post-traumatic stress disorder arising out of a "really bad experience" in 1984. (Tr. 46-47). She sees a therapist once a month. (Tr. 47). Her psychiatrist recently took her off medication because it was not helping and she experienced bad side effects. (Tr. 48-49).

A vocational expert testified that, if he assumed the mental limitations that were assessed by Dr. Bruce Amble in a report dated November 20, 2009, plaintiff would not be able to do any work. (Tr. 54).

**3.    Medical Records Related to Mental Impairments**

Ms. Neabuhr received mental health treatment from APN Mary DeClue at St. Mary's Hospital in Centralia, Illinois, beginning on January 9, 2008. On that date, her chief complaint was "needs documentation." (Tr. 489). On mental status evaluation, her thought processes were coherent, and her behavior was cooperative. Her mood was depressed, her judgment was poor and her insight was marginal. She denied suicidal thoughts. Her GAF was assessed at 60. (Tr. 493-494). She had a history of chronic fatigue which resulted in her being fired from multiple jobs in the past 20 years. APN DeClue recommended that she see a therapist and try yoga and exercise. She prescribed Lexapro. (Tr. 495).

APN DeClue saw Ms. Neabuhr three more times through March, 2008. On each visit, plaintiff reported bad reactions to the medication that had been prescribed, and APN DeClue prescribed something different. APN DeClue consistently assessed her as well dressed and groomed, and her thought content as normal. She had no suicidal thoughts, and was alert and oriented. Her judgment and insight were described as normal. Her behavior was cooperative. Her mood was depressed. (Tr. 486-501).

On March 25, 2008. APN DeClue completed a Mental Residual Functional

Capacity Questionnaire. (Tr. 684). When asked to describe the clinical findings which demonstrate the severity of Ms. Neabuhr's mental impairments, she listed clean appearance, coherent thought processes, cooperative behavior, depressed and discouraged affect, lack of motivation, insomnia, decreased energy, paranoia at times, no hallucinations or delusions. She noted that plaintiff was doing better with psychotherapy. The second page of the form is a lengthy list of signs and symptoms. APN DeClue wrote that she put an "X" by the items identified by plaintiff, and circled the ones she herself had observed. Of the 19 signs and symptoms identified by plaintiff, APN DeClue observed only 7. (Tr. 685). APN DeClue then checked "seriously limited" or "unable to meet competitive standards" in a number of functions, including ability to maintain attention, deal with normal work stress and maintain socially appropriate behavior. (Tr. 686-687).

Plaintiff received outpatient therapy from a therapist at St. Mary's Hospital in Centralia, Illinois. In the initial interview on March 25, 2008, she said she had been depressed all of her life and that she had a history of PTSD. She said she had memory problems and that she was up at night "worrying about everything." On mental status assessment, her thought process, speech and judgment were normal. Her mood was depressed and her affect was blunted. Her insight was adequate and she had no hallucinations. She noted having passive suicidal thoughts since childhood. On the Burns Depression Checklist, she was rated at 75, which is in the severe range. On the Burns Anxiety Inventory Score, she was rated at 92, which indicates extreme anxiety or panic. (Tr. 414). It was noted that she lived with her ailing parents and that she took care of their needs and sought resources for them. (Tr. 415). She was seen for individual therapy twice in April, 2008. (Tr. 411).

6

In April, 2008, plaintiff told her therapist that taking care of her parents was a "full time job." (Tr. 924).

Fred D. Klug, PhD, performed a consultative psychological examination on July 14, 2008. Dr. Klug reviewed records and spent about 55 minutes with plaintiff. In his assessment, her immediate and long-term memory were intact; attention span was adequate; reasoning, ability to do simple calculations and abstract thinking were good; judgment and insight were poor; thought processes were goal-directed and relevant; affect was appropriate and consistent with thought content. She denied suicidal thoughts, but said she frequently feels she would be better off dead. (Tr. 530-533).

On July 18, 2008, APN DeClue noted that plaintiff was seeing Dr. Katz. She had not taken the Remeron that had been prescribed. She had taken Ativan and she was "overwhelmed" by it. Plaintiff said she liked the idea that Dr. Katz was a medical doctor, so the session was cut short "to refer services back to Dr. Katz." (Tr. 528).

On July 21, 2008, plaintiff reported to her therapist that her father was in the hospital and she and her mother were spending most of their days with him. She had an appointment with a psychologist "for disability" and was seeing Dr. Katz for medical management. (Tr. 920). In August, 2008, she said that she was sending resumes to contractors for possible employment in the defense field. (Tr. 918). On these visits, the therapist noted that she was talking and cooperative, but her affect was anxious.

State agency consultant Howard Tin completed a Mental RFC Assessment on July 31, 2008. He concluded that she had no limitation or no significant limitation in a number of functions, including ability to remember, understand and carry out short and simple instructions, to maintain regular attendance and be punctual, to sustain an ordinary routine, to make simple

7

work-related decisions, to complete a normal workweek without interruptions from psychological symptoms, to accept instructions and respond appropriately to criticism and to maintain socially appropriate behavior. He did not assess marked limitation in any category. (Tr. 556-558).

In October, 2008, plaintiff told her therapist that she questioned whether she was more male or female, and that this had been an issue for her since adolescence. (Tr. 914).

Dr. Katz wrote a note in November, 2008, stating that plaintiff would not take medication that was prescribed for her because of her perceived reactions to it. He had prescribed Nortriptyline 10 mg. She dumped out most of the contents of a capsule and took only a small amount. She said she slept for 2 days. He stated that this was "not a physiological response." He informed her that he did not have anything to offer her "unless she really wants to make herself treatable." (Tr. 829).

In December, 2008, plaintiff told her therapist that she was questioning her purpose for living and stated she did not feel either male or female. (Tr. 910). The next month, plaintiff discussed with the therapist "seeking gender neutral activities." Her affect was noted to be happy. (Tr. 908).

In March, 2009, Dr. Mellin described her as "somatic" and noted that she "presents better than she describes." (Tr. 819). In May, 2009, plaintiff told Dr. Mellin that she was hesitant to take medication because she had bad reactions to it. She was noted to be depressed, but her thought processes and insight were normal. (Tr. 809-810).

On November 2, 2009, Ms. Neabuhr told her therapist that she had been able to get her father approved for a VA program which allowed $800.00 per month for help around the house. Her affect was described as happy. (Tr. 835).

8

Bruce Amble, PhD, performed a consultative psychological examination on November 20, 2009. Dr. Amble noted that plaintiff's clothing was clean and weather appropriate. She had no problems with grooming or hygiene. She was responsive, compliant, police and friendly. Dr. Amble administered the Minnesota Multiphasic Personality Inventory-2, the Beck Anxiety Inventory and the Beck Depression Inventory, but none of the tests resulted in a valid score. He concluded that, in general, she was able to understand and remember simple inquiries and her response time was not problematic. Her social interaction was "limited but not difficult in the interview." He observed that her ability to deal with the stress of employment would be problematic. (Tr. 676-682).

Dr. Amble also completed a "check box" form entitled Medical Source Statement of Ability to Do Work-Related Activities (Mental). He checked the box for marked limitation in a number of areas, including ability to make judgments on complex work-related decisions, interact appropriately with supervisors and co-workers, and to respond to usual work situations and to changes in routine. He did not fill in the part of the form which asked him to identify the factors that support his assessment. (Tr. 672-674).

On November 24, 2009, Ms. Neabuhr saw Dr. Mellin. She told Dr. Mellin that she had been on a number of antidepressants since 1993, but she had "severe" side effects from each one. On psychiatric exam, her behavior was normal and she was cooperative. Her mood was not depressed or anxious. Thought processes were not impaired and her insight was intact. She had no suicidal ideation and her energy level was normal. (Tr. 804-805).

Plaintiff's therapist again described her as happy on November 30, 2009, and the therapist noted that she had been "generally feeling well mood-wise." (Tr. 834). She stated that she had devoted the past 5 years to taking care of her parents. (Tr. 834). She also reported that

one of her doctors had told her that she was female. (Tr. 843).

## Analysis

Ms. Neabuhr's only point is that the ALJ erred in weighing the medical opinions. She first agues that the ALJ erred in rejecting the opinion of Dr. Amble, who performed a consultative examination.

The ALJ discussed Dr. Amble's opinions at Tr. 18. She recognized that Dr. Amble assessed moderate to marked limitations in a number of areas of functioning. However, she determined that Dr. Amble's opinion was entitled to no weight because he had seen plaintiff only once, his conclusions were not supported by the observations expressed in his narrative report, and his conclusions were contradicted by the findings of other doctors.

Dr. Amble did not treat Ms. Neabuhr. Thus, in the parlance of the social security system, he is a nontreating source. The opinion of a nontreating source is not entitled to controlling weight. ***Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009)**. Rather, the ALJ is required to evaluate the opinion in light of the factors enumerated in 20 C.F.R. §404.1527(d). ***Ibid***.

ALJ Mein applied the relevant factors in considering Dr. Amble's opinions. She considered the nature of the relationship between the doctor and the claimant, and the supportability and consistency of his opinions. The ALJ noted that Dr. Amble saw plaintiff only once. She reasonably concluded that his opinion was not supported by his own examination in that he found that she was responsive, compliant, polite and friendly, which contradicted his assessment that she had marked limitations in her ability to interact with supervisors and co-workers. Citing to specific medical records, she also reasonably concluded that Dr. Amble's opinion was not consistent with other evidence in the record. These are proper considerations under §404.1527(d).

Plaintiff suggests that the ALJ was bound to accept Dr. Amble's opinion because there were no contrary medical opinions. This argument is incorrect as a matter of law and of fact. The Seventh Circuit has called this "too narrow a view" and has held that an ALJ is not required to accept a nontreating source's opinion even if it is not refuted by another medical opinion. Rather, the ALJ should not accept a medical opinion if it is refuted by other evidence, and the other evidence need not be medical in nature. ***Simila*, 573 F.3d at 514-515.**

In any event, Dr. Amble's opinion was contradicted by other medical evidence in the record. As the ALJ noted, Dr. Mellin, who was a treating source, reported essentially normal findings when she examined plaintiff just a few day after Dr. Amble's examination. Dr. Klug had examined plaintiff earlier, and he reported that she was cooperative and her attention span, memory, reasoning and ability to do simple calculations were intact. Dr. Katz, another treating source, reported that plaintiff was friendly and cooperative, and her thought processes were logical, coherent and goal related. (Tr. 18).

Plaintiff seems to be arguing that the ALJ was required to accept Dr. Amble's RFC assessment because no other doctor provided a contrary assessment. This is incorrect. The assessment of RFC is an issue that is reserved to the Commissioner; it is not a "medical opinion" and a doctor's assessment of RFC is not binding on the ALJ. 20 C.F.R. §404.1527(e).

Ms. Neabuhr also suggests that the ALJ impermissibly "played doctor" by substituting her own medical judgment for that of Dr. Amble. On the contrary, as was explained above, the ALJ relied on other medical evidence which contradicted Dr. Amble's opinion. She did not draw her own medical conclusions or substitute her own opinion for that of Dr. Amble on medical issues.

Plaintiff also takes issue with the ALJ's weighing of APN DeClue's opinion. She

11

recognizes that, as a nurse practitioner, APN DeClue is not an "acceptable medical source" pursuant to 20 C.F.R, §404.1513(a). However, as she points out, evidence from so-called "other sources" may be relevant to the severity of plaintiff's impairments and their impact on plaintiff's ability to work. §404.1513(d). These observations are accurate, but irrelevant, since ALJ Mein did consider APN DeClue's opinion.

The ALJ weighed APN DeClue's opinion using the regulatory factors. She determined that her opinion was not supported by her own findings and was contradicted by other medical evidence in the record.

In short, it was the province of the ALJ to weigh the medical evidence. ALJ Mein did so here, applying the regulatory factors and sufficiently building the required logical bridge from the evidence to her conclusions. See, **Vilano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.** This Court may not reweigh the evidence or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**.

## Conclusion

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made. Therefore, the final decision of the Commissioner of Social Security, finding that plaintiff Janet Y. Neabuhr is not disabled, is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATED: December 14, 2011.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
